# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas A. Kelley, *in his capacity as the PCI Liquidating Trustee for the PCI Liquidating Trust*,<br><br>    Plaintiff,<br><br>v.<br><br>Chris M. Kanios; Chris M. Kanios 401(k) Savings Plan; National City Bank, *as Custodian of the Chris M. Kanios 401(k) Savings Plan*; and Steve Papadimos,<br><br>    Defendants. | Case No. 18-cv-823 (SRN/SER)<br><br><br><br>**MEMORANDUM ORDER AND OPINION** |

Elizabeth M. Forsythe, Michael E. Rowe, J. David Jackson, and Lucas J. Olson, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN, 55402, for Plaintiff.

Henry B. Roberts, Jr., H. Buswell Roberts, Jr. PLLC, 200 Country Club Road Southwest, Suite B1, Blacksburg, VA 24060, and Michael L. Gust, Anderson, Bottrell, Sanden & Thompson, PO Box 10247, Fargo, ND, 58106, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This case arises out of the wreckage of local businessman Tom Petters's infamous, years-long Ponzi scheme, which lasted from the mid-1990s through June 2008, and which left Petters's creditors with over three *billion* dollars in unpaid liabilities. In this particular case, Plaintiff, the Liquidating Trustee for one of Petters's now-defunct companies, Petters Company Inc. ("PCI"), seeks to "avoid," or "claw back," approximately four million dollars of interest payments, or "transfers," received by Defendants Steve Papadimos and

Chris M. Kanios during the heyday of Petters's scheme, *i.e.*, 1997 to 2006, on grounds that those interest payments (and the promissory notes underlying the payments) were made directly in furtherance of Petters's fraud, and are therefore subject to "claw back" under the Trustee's interpretation of the Minnesota Uniform Fraudulent Transfers Act ("MUFTA"). Because the Court agreed with the Trustee's interpretation of MUFTA during a November 2018 jury trial the Court conducted in a companion case to this one, *see Kelley v. Boosalis*, No. 18-cv-868 (SRN/TNL), 2018 WL 6322631 (D. Minn. Dec. 3, 2018), and because the Trustee believes there are no material facts in dispute that would warrant another jury trial here, the Trustee now moves for summary judgment.

Defendants not only oppose the motion, but argue that *they*, not the Trustee, are the parties entitled to summary judgment. This is so, Defendants argue, because the Court erred in the *Boosalis* case. And, Defendants continue, were the Court to adopt the "proper" interpretation of MUFTA here, the Trustee's case would fail as a matter of law. In the alternative, Defendants also argue that the Court should certify the meaning of certain critical terms under MUFTA to the Minnesota Supreme Court, so that that Court could resolve what Defendants describe as "unsettled" questions of state law. Defendants further contend that, at the least, the Trustee's summary judgment motion should be denied on grounds that a jury trial is still needed to resolve genuine disputes of material fact.

For the reasons explained below, the Court grants the Trustee's summary judgment motion in full. Judgment will accordingly be entered for the Trustee.

## I.     BACKGROUND

### A. Factual History[1]

#### 1. Defendants Lend Millions of Dollars to Petters Company, Inc., Between 1997 and 2006, and Receive Millions of Dollars of Interest in Return

Steve Papadimos and Chris Kanios (collectively, "Defendants") are a married couple that live in the suburbs of Toledo, Ohio. Papadimos is a government attorney and Kanios is a physician. (*See* Pl.'s Ex. 30 [Doc. No. 110-3] ("Kanios Dep.") at 6-7.) At some point in 1997, Papadimos heard about an investment opportunity with a Minneapolis businessman named Tom Petters, and, more specifically, with a "diverting" business that Petters was running with consumer goods. In short, Papadimos believed, Petters needed Papadimos's money so that Petters could buy large lots of older, unsold consumer goods from wholesalers, and then re-sell, or "divert," those goods to retailers at a substantial profit. (*See, e.g.*, Pl.'s Ex. 23 [Doc. No. 110-2] ("Papadimos Dep. I") at 46-47 (Q: What did you think were funding? A: Oh, that I was lending money. . . there would be promissory

---

[1]     In describing the background of this case, the Court will occasionally cite to testimony that certain key witnesses have given (under oath) in other Petters-related trials. Although Defendants argue that citing this testimony constitutes hearsay or is precluded by collateral estoppel (*see* Defs.' Br. in Opp. to Pl.'s Mot. for Summ. J. [Doc. No. 112] ("Defs.' Opp. Br.") at 14-17), the Court disagrees. The Trustee has amply demonstrated that all of the testimony cited herein could be produced "in a form that would be admissible in evidence" at trial. *Target Corp. v. All Jersey Janitorial Serv., Inc.*, 916 F. Supp. 2d 909, 914 (D. Minn. 2013). That is, either the witness will be available for this trial, or, if not available, their testimony would constitute non-hearsay under Fed. R. Evid. 804(b)(1). (*See, e.g.*, Pl.'s Reply Br. [Doc. No. 116] at 6 (noting that "[s]hould [this case] proceed to trial, Coleman and Martens, both of whom testified at the [earlier, related] *Boosalis* trial and gave depositions, can and will so testify again").) And, as for "collateral estoppel," that doctrine is irrelevant under the circumstances; the Court is not attempting to conclusively apply any of its prior factual findings or rulings against Defendants.

notes, and that Petters, PCI was buying distressed goods, bankruptcy goods, liquidated goods, and re-selling them."). Papadimos also thought that, because Petters was working with "distressed goods and bankruptcy goods," Petters would be generating 40 to 60 percent in "annual rate[s] of return." (*See* Defs.' Ex. B. [Doc. No. 105-1] ("Papadimos Dep. II") at 17 (describing a conversation he had with one of Petters's associates).)

Before investing with Petters, though, Papadimos did some due diligence. Among other things, he (a) had a short meeting with Petters in Minneapolis, and, while there, observed that Petters owned actual warehouses and retail stores that had "thousands of boxes" inside of them (*see* Papadimos Dep. II. at 13-14), (b) spoke with Thomas Hays (a well-regarded lawyer who worked with Petters) on multiple occasions, and learned that Hays was confident about Petters's business acumen (*id*. at 15-19), (c) talked to at least one business that Petters had purportedly conducted a merchandise transaction with, Montgomery Ward, and confirmed that a business relationship existed between the two companies (*id*. at 34, 76), and (d) read articles in the *Minneapolis Star-Tribune* newspaper about Petters's businesses (thus again confirming the fact that the businesses did exist) (*id*. at 31, 76, 132).

Consequently, in July 1997, Papadimos decided to begin lending to Petters's wholly-owned company, Petters Company, Inc. ("PCI").[2] (*See* Defs.' Ex. J [Doc. No. 105-2] ("July 8, 1997 Promissory Note").) Papadimos first lent money to PCI in 30- or 60-day loans, with an annualized interest rate averaging about 38 percent. (*See* Pl.'s Ex. 22 [Doc.

---

[2]     Petters was, at all relevant times, PCI's sole shareholder and President. (*See* Pl.'s Ex. 2 [Doc. No. 110-1] ("Petters Crim. Trial Tr.") at 646-48 (Coleman).)

No. 110-2] ("Martens – Papadimos Tracing Report") at ECF p. 494.) As time went on, however, Papadimos lent Petters larger sums of money, and often simply "rolled" his principal investment from one promissory note to another, so as to keep receiving interest payments without putting any "new" money into PCI. (*See* Pl.'s Ex. 20 [Doc. No. 110-2] ("Martens – Papadimso Transfers Report") at ECF p. 445 (showing that Papadimos stopped investing new principal into PCI in 2001).)

Moreover, in March 2000, Papadimos also convinced his wife, Chris Kanios, to invest some of her personal 401(k) retirement fund with PCI, too, on virtually identical terms to his own loans. (*See* Kanios Dep. at 7-8; *accord* Pl.'s Ex. 29 [Doc. No. 110-3] ("Martens – Kanios Tracing Report") at ECF p. 54.) Kanios relied entirely on her husband's due diligence, and "had no understanding of what PCI's business was." (Kanios Dep. at 11.)

The couple continued to lend money to PCI until 2005, when PCI told them that it only wanted to work with larger-scale investors, like hedge funds, from then on out. (*See* Papadimos Dep. II at 13, 17.) Shortly thereafter, PCI re-paid Defendants their principal investment(s) in full. (*See* Papadimos Dep. I at 107.)

In sum, between July 1997 and March 2006, Papadimos lent $3,297,300 to PCI, arising out of at least 87 promissory notes and 115 related "transactions." (*See* Martens – Papadimos Tracing Report ¶¶ 9, 12; *see also id.* at n.2 (noting that "the difference between the 115 transactions and the 87 promissory notes" arose for "one of the following reasons": "(1) rolling of principal and/or interest on certain notes; (2) multiple interest and/or principal payments on the same note; or (3) reversals due to insufficient funds, uncollected

checks, or missing endorsements").) In return, PCI paid Papadimos $3,126,524.37 in interest. (*See id.* ¶ 9.)[3]

Similarly, between March 2000 and March 2006, Kanios lent $690,000 to PCI, arising out of at least 13 promissory notes and 21 related transactions. (*See* Martens – Kanios Tracing Report ¶¶ 9, 12.) In return, PCI paid Kanios $572,500.22 in interest. (*See id.* ¶ 9; *accord* Kanios Dep. at 14-15 (admitting that she received this amount in interest income).)

Notably, during this entire time period, it is undisputed that Defendants believed they were investing in PCI's "diverting" business, and in the merchandise purchases and re-sales undergirding that business; they did not believe they were providing general business loans to PCI. (*See supra* at 3-4.) In fact, the vast majority of the promissory notes Defendants signed with PCI included a security interest in a *specific* order of merchandise that PCI had purportedly bought with Defendants' money, as well as in any proceeds from sales of that merchandise. (*See* Matens – Papadimos Tracing Report ¶ 33 (stating that 74

---

[3]     Defendants argue that Papadimos only received $2,756,054 in interest income. (*See* Defs.' Br. in Support of Summ. J. [Doc. No. 104] ("Defs.' Summ. J. Br.") at 6.) In support of this argument, Defendants contend that a "corrected 2006 Form 1099-INT," showed that Papadimos only received $63,436.83 in interest income in 2006, as opposed to the $370,697.87 originally reported. (*See* Defs.' Ex. H [Doc. No. 105-2] ("April 2008 Letter in Connection with Corrected 2006 Form 1099-INT").) However, as the Trustee pointed out at oral argument, its expert forensic account, Mr. Theodore Martens, took this corrected 1099 form into account when calculating the amount of interest Papadimos received from PCI. Defendants' counsel did not attempt to rebut this interpretation of Mr. Martens's accounting at any point during the hearing, and the Court cannot find any evidence in the record that would have allowed them to do so. As such, there is no genuine dispute as to the amount of interest Papadimos earned as a result of his transactions with PCI.

of Papadimos's promissory notes referenced a security agreement and accompanying "purchase order" underlying that agreement); Martens – Kanios Tracing Report ¶ 28 (same, with respect to nine of Kanio's promissory notes).) What's more, these security agreements contained language confirming that the express purpose of Defendants' loans was to allow PCI to purchase, and then re-sell, merchandise, *i.e.*, "[t]his Security Interest is granted to secure payment of funds loaned to [PCI] which *has enabled or is intended to enable* [PCI] to *acquire rights in or use of certain merchandise*, which the *parties understand and anticipate that* [PCI] *intends to resell as part of its business*." (*See generally* Defs.' Ex. M [Doc. Nos. 105-3 to 105-4] ("Defendants' Loan Documentation") (approximately 100 pages of promissory notes, security agreements, and purchase orders exchanged between PCI and Defendants, all containing materially identical language).) These purchase orders and security agreements constituted an "important factor" in encouraging Defendants to invest with PCI. (Papadimos Dep. I at 84.)[4]

> ### 2. In 2008, the Public Learns that PCI Was Actually a Massive, Years-Long Ponzi Scheme, In Which Funds from Investors Like Defendants Were Primarily Used to Re-Pay Other Investors, Rather Than to Finance Legitimate Commercial Transactions

---

[4]     As mentioned above, a few of the promissory notes Defendants signed with PCI did not contain a security agreement making any kind of representation as to how Defendants' loan would be spent. However, not only did these few non-securitized loans exclusively occur near the tail end of Defendants' business relationship with PCI (*see, e.g.*, Defs.' Ex. N [Doc. No. 105-2] ("2005 Loan Documentation")), but there is no evidence that either Defendant changed their interpretation of what they were investing in because of this slight change in documentation. (*See, e.g.*, Papadimos Dep. II at 91 (admitting that he did not even recall that "at some point . . . no security agreements were provided with the promissory note")).)

In reality, however, Defendants were not investing in a diverting business, much less in specific merchandise transactions. Rather, Defendants were investing in a Ponzi scheme that maintained only a superficial veneer of a diverting business. *See, e.g.*, *United States v. Petters*, 663 F.3d 375 (8th Cir. 2011) (providing general background on the now-infamous "Petters Ponzi Scheme"). As one of the key participants in this scheme (Deanna Coleman) has repeatedly testified since she first turned state's witness in 2008, including in a lengthy deposition she sat for in this case, "all of" the purchase orders attached to Defendants' security agreements were either vastly overstated or fabricated in their entirety. (*See* Pl.'s Ex. 13 [Doc. No. 110-1] ("Coleman Dep. I") at 88 ("[I]nvestors [in PCI] never invested in a real transaction with a real purchase order, because every purchase order that [an] investor received or invested in was fake."); *accord* Pl.'s Ex. 1 [Doc. No. 110-1] ("Boosalis Civil Trial Tr.") at 232 (Coleman); Petters Crim. Trial Tr. at 648 (Coleman).) Instead, Coleman testified, PCI's three principal officers (Coleman, Petters, and a man named Bob White) essentially operated the company as a four-part scam: *first*, PCI would conduct some unprofitable, low-volume diverting business for show (ala a Potemkin village); *then*, Coleman or White would forge purchase orders and bank statements to make investors believe that those low-volume "Potemkin deals" were actually high-volume purchases resulting in multi-million dollar sales; *next*, PCI would use its fake purchase orders (and high promised returns) to solicit "securitized loans" from investors like Defendants; and, *finally*, PCI would use these loans to re-pay *other* investors as *their* loans became due (or to pay expenses otherwise unconnected to PCI's purported

diverting business). (*See generally* Coleman Dep. I; *accord* Boosalis Civil Trial Tr. at 227-33 (Coleman); Petters Crim. Trial Tr. at 632-48 (Coleman).)

With respect to Papadimos in particular, Coleman testified as follows:

> Q: Do you recall ever speaking to [Papadimos]?
> . . .
> A: Yeah, I talked to [him].
> Q: Do you remember what you talked about?
> A: If [PCI] needed money I might have called him up and asked for two, three million dollars to do a certain deal.
> Q: And at the time you called him to ask him to do a certain deal, were you providing false or misleading invoices at that time?
> A: Yes.
> Q: And I think you testified that there was not one legitimate invoice ever used with the small investors,[5] is that correct?
> A: There was no real purchase order ever given to an investor, correct.

(Coleman Dep. I at 193-94.)

At a subsequent deposition, Ms. Coleman further noted that the "Montgomery Ward" deal that Papadimos had relied on as part of his due diligence had, in fact, been one of PCI's signature "Potemkin deals," in which Petters (and Coleman) vastly overstated the amount of merchandise PCI had purchased from Montgomery Ward, and then lied about the millions of dollars in "accounts receivable" it was "owed" from purported "re-sales" of that inventory. (*See* Pl.'s Ex. 1 [Doc. No. 115-1] ("Coleman Dep. II") at 370-76.)

---

[5] For context, from 1996 to 2008, PCI entered into 3,800 promissory note transactions with 153 "private," or "small," investors, many of whom were similarly situated to Defendants. (*See* Pl.'s Ex. 17 [Doc. No. 110-2] ("2010 PriceWaterhouseCoopers Interim Global Report") ¶ 124.) Although PCI moved away from these private investors and toward "large investment funds" in the early 2000s (*id*. ¶ 134), Ms. Coleman nonetheless testified that private investors like Defendants were essential to PCI's scheme because traditional banking was "very hard" for PCI. (*See* Coleman Dep. I at 233.)

On a more general level, Coleman also testified that she, Petters, and White had been intentionally committing this fraud since 1994. (*See* Coleman Dep. I at 21, 24, 208-09; *accord* Boosalis Civil Trial Tr. at 228 (Coleman); Petters Crim. Trial Tr. at 567, 773-74 (Coleman).) Indeed, shortly after the FBI discovered this scheme, Coleman pled guilty to conspiracy to commit mail fraud. (*See* Pl.'s Ex. 10 [Doc. No. 110-1] ("Coleman Criminal Judgment").) White similarly pled guilty to two criminal charges – aiding and abetting mail fraud, and illegal monetary transactions – and testified as such at Petters's criminal trial. (*See* Pl.'s Ex. 11 [Doc. No. 110-1] ("White Criminal Judgment"); Petters Crim. Trial Tr. at 1271 (White) (admitting that he forged "hundreds of millions of dollars" of merchandise sales to wholesalers that did not in fact occur).) And, perhaps most notably, after a month-long trial, a jury found Petters guilty of 20 criminal charges, including 13 counts of wire fraud and mail fraud, and four counts of money laundering. (*See* Pl.'s Ex. 9 [Doc. No. 110-1] ("Petters Criminal Judgment").)[6]

Coleman similarly testified that she, Petters, and White took substantial steps to keep this scheme secret from both investors and other PCI employees, such as by falsifying bank account, profit and loss, and insurance statements. (See Pl.'s Ex. 14 [Doc. No. 110-1] ("Coleman Dep. II") at 389-90, 409-10; Petters Crim. Trial Tr. at 1140-41, 1163-66

---

[6]     Although Petters steadfastly maintained his innocence during both his trial and direct appeal (neither of which succeeded), at a subsequent habeas proceeding in 2013, Petters admitted that he had "help[ed] orchestrate a fraud" with PCI since the early 1990s, that he "knew" PCI had been "robbing Peter to pay Paul," and that he committed all of this misconduct "intentionally." (Pl.'s Ex. 8 [Doc. No. 110-1] ("Petters 2013 Habeas Hr'g Tr.") at 31, 38, 76.)

(White).) PCI's tax accountant, James Wehmhoff, also testified that, in 2007, he discovered that PCI had been "maintain[ing] two different sets of books," which he understood to be evidence that PCI was "tell[ing] investors or lenders one thing," but then "us[ing] funds for something else." (Pl.'s Ex. 15 [Doc. No. 110-1] ("Wehmhoff Dep.") at 40, 55-56.)[7]

Moreover, in an exhaustive forensic accounting investigation conducted after the Petters Ponzi Scheme became public knowledge, the Trustee's expert forensic accountant (the aforementioned Theodore Martens) discovered that PCI had effectively been insolvent from December 31, 1996 until its collapse in 2008. (*See* Pl.'s Ex. 19 [Doc. No. 110-2] ("Martens Solvency Report") ¶ 9.) In other words, at the end of 1996, PCI's liabilities exceeded its assets by at least $6.5 million, and that gap only increased until it had reached $3.25 billion by June 2008, when PCI went out of business as a result of the criminal prosecutions. (*Id*. ¶ 20; *cf.* Wehmhoff Dep. at 69-72 (noting that the tax returns he prepared for PCI in 2000, 2001, and 2002 all showed losses in the tens of millions of dollars).) This insolvency occurred largely because "the assets reported on the PCI Balance Sheets included fictitious accounts receivable and inventory balances that resulted from falsified purchases of goods." (*Id*. ¶ 15.) Indeed, Martens added, "PCI . . . did not engage in actual inventory and accounts receivable financing, with the exception of some limited transactions involving the purchase of small amount of goods." (*Id.*) Petters also did not contribute much of his own capital to PCI, which, in Martens's opinion, further

---

[7]     In October 2010, Wehmhoff also pled guilty to two criminal charges: "conspiracy to defraud the United States," and "aiding and assisting in filing of false tax returns." (*See* Pl.'s Ex. 12 [Doc. No. 110-1] ("Wehmhoff Criminal Judgment").)

"evidence[d] . . . that [PCI] served no functional purpose from [its] inception other than to perpetuate the fraud." (*Id*. ¶ 24.)[8]

Importantly, Martens and his forensic accounting team also built upon Coleman and White's generalized "Ponzi scheme testimony" by conducting an ex-post, individualized "tracing" investigation with respect to each PCI investor (including both Defendants here). As part of this investigation, Martens scoured PCI's bank account records (and any other available evidence) to glean whether any individual loan was used to fund a real merchandise order, as well as whether that loan was re-paid from revenue earned from the re-sale of a real merchandise order. With respect to both Papadimos and Kanios, Martens found "no evidence" "to indicate that any of the transactions to/from [Defendants] were related to potentially real PCI purchases and/or sales transactions," but that, "rather," "the funds received from/sent to [Defendants] were part of the rolling churn of the Petters Ponzi Scheme." (Martens – Papadimos Tracing Report ¶ 35; Martens – Kanios Tracing Report ¶ 30.)

Martens concluded that Defendants' funds were "part of the rolling churn of the Petters Ponzi Scheme," based largely upon the (highly suspect) timing between incoming loans and outgoing loan payments. (*See* Martens – Papadimos Tracing Report ¶ 15.c

---

[8] By contrast, Martens separately analyzed Petters Group Worldwide ("PGW"), a different Petters entity that owned companies such as "Fingerhut," "RedTag," and "Polaroid," all of which conducted some modicum of "real business." (*Id*. ¶¶ 28, 32, 35.) Although Martens found that the "vast majority of [these PGW] businesses lost money and accumulated significant deficit balances" (*id*. ¶ 28), he acknowledged that, unlike PCI, PGW was not a complete fraud from the outset, and accordingly did not become irreparably insolvent until December 31, 2002. (*See id*. ¶ 9.)

("[W]e observed that the typical churn of the Ponzi scheme was such that cash received on one day was disbursed to other investors the same or the day after."); *accord* Coleman Dep. II at 443 (Q: What did [PCI] then use to pay investors' notes? Where did the money come from? A: Other investors.").) Although Martens acknowledged that several of Defendants' transactions occurred around the same time as "real" PCI "purchases/sales," Martens ultimately concluded that no evidence linked that (extremely limited) "real" activity to Defendants' money. (*See, e.g.*, Martens – Papadimso Tracing Report ¶¶ 22, 27-29; Martens – Kanios Tracing Report ¶¶ 20-21, 24-25.) In fact, Martens specifically analyzed the *relative* amount of "real sales activity" in PCI's bank accounts during each of these "ambiguous" time periods, and found that the amount of money flowing through the Ponzi scheme substantially dwarfed the amount of money flowing from "real business." (*See, e.g.*, Martens – Papadimos Tracing Report ¶ 27 (finding that, although Papadimos received an interest payment of $3,300 on May 3, 1999, which was three days after PCI received a $68,798.64 "sales" payment, there was "no evidence to suggest that the payment to [Papadimos] was funded by potentially real sales transactions," and further noting that, "excluding the $68,798.64 incoming transfer marked "SALES," *over $8.4 million* was deposited into [PCI's] bank account between April 29, 1999 and May 3, 1999 from the serial churn of the Petters Ponzi scheme") (emphasis added).)

Martens also conducted a "cash tracing analysis" to determine if any of Defendants' money flowed to one of Petters's more "legitimate" companies (*see supra* n.8), and was then used for real diverting activity. (*See, e.g.*, Martens – Papadimos Tracing Report ¶ 30; *see also* Defs.' Ex. J [Doc. No. 113-2] ("Martens Intercompany Analysis") (showing that,

between December 1999 and September 2008, approximately three percent of PCI's $50 billion cash flow either went to, or came from, other Petters entities).) However, after a thorough investigation of available records, Martens likewise concluded that no evidence showed that "transfers to/from [these] other entities . . . relate[d] directly to any of Defendants' PCI Note Transactions and/or indicate[d] that Defendants either (1) [were] potentially involved in the funding of any potentially real purchases, or (2) received the proceeds of potentially real sales made by those entities." (Martens – Papadimos Tracing Report ¶ 30; Martens – Kanios Tracing Report ¶ 26.) Martens specifically re-affirmed this conclusion at his deposition. (*See* Defs.' Ex. G [Doc. No. 113-2] ("Martens Dep.") (stating that Defendants' funds were not even used "indirectly," "through another Petters entity," to "acquire" "real goods, real inventory, for subsequent resale").)

## B. Procedural History

### 1. Petters Company Inc., Declares Bankruptcy and the Liquidating Trustee Commences Dozens of Adversary Proceedings to Claw Back Interest Payments Made to "Early" Investors Like Defendants

In October 2008, after Petters was arrested and indicted, the District Court appointed Douglas A. Kelley, Esq., as a "receiver," "to take control of the assets of Tom Petters." *In re Petters Co. Inc.*, 494 B.R. 413, 417 (Bankr. D. Minn. 2013). The case was then converted into a consolidated Chapter 11 bankruptcy, under the supervision of then-Chief Bankruptcy Judge Gregory F. Kishel. *Id.* Kelley was subsequently appointed Trustee for the entire Petters estate. *Id.*[9] Perhaps unsurprisingly, at the time of PCI's collapse, "very little money

---

[9]     One of the entities Petters owned, Polaroid, entered bankruptcy in a separate proceeding and with a separate Trustee (John R. Stoebner). *See In re Petters Co., Inc.*,

was left in the coffers of the business entities involved, and there were relatively few hard assets to show for all of the pre-[bankruptcy] activity." *Id*. at 418. Indeed, "[a]fter the collapse of the scheme in 2008, the last lenders to [the Petters companies] were left unpaid and unsatisfied to the extent of *over 3.5 billion dollars*." *In re Petters Co., Inc.*, 495 B.R. 887, 892 (Bankr. D. Minn. 2013) (emphasis added). Thus, to recover assets for the creditors that had lost billions of dollars of *principal* as a result of Petters's scheme, all of whom had filed proofs of claim in the Bankruptcy Court, the Trustee (Kelley) commenced approximately 200 "adversary proceedings" against "net winner" PCI investors, like Defendants, in hopes of "clawing back" those investors' *interest earnings* (or "profits") for the benefit of the estate. *In re Petters Co., Inc.*, 494 B.R. at 417-18. These proceedings were (and still are) immensely complicated, and the Court will not attempt to summarize them here. *See id.* at 418 (noting that, "[o]ver a period of more than two decades, the Petters-controlled entities had made tens of thousands of transfers, almost all in the form of money, to a large number and variety of lenders, 'investors,' charitable donees, and other parties").

What is important, though, is the Trustee's "theory of the case," particularly as it relates to smaller, private investors like Defendants. Put simply, the Bankruptcy Code allows a Trustee to "avoid," or, "claw back," payments made to creditors prior to the bankruptcy filing, for the benefit of the estate, if the transfers were "fraudulent" within the

---

455 B.R. 166, 170 (8th Cir. BAP 2011). However, because of the proceedings' interconnectedness, Judge Kishel presided over that bankruptcy, too. *Id.*; *see also Stoebner v. Opportunity Finance, LLC*, 909 F.3d 219 (8th Cir. 2018) (providing further background on Polaroid's bankruptcy).

meaning of applicable state "fraudulent transfers" law, here, the Minnesota Uniform Fraudulent Transfers Act ("<u>MUFTA</u>"). *See In re Petters Co., Inc.*, 495 B.R. at 892 (citing 11 U.S.C. §§ 544(b) and 550(a)). MUFTA deems a transfer "fraudulent," if either **(A)** the debtor "made the transfer . . . with *actual intent* to hinder, delay, or defraud any creditor of the debtor," and the transferee cannot show that they accepted the transfer "in good faith *and* for a reasonably equivalent value," *see* Minn. Stat. §§ 513.44(a)(1) and 513.48(a) (the "actual fraud" theory); or **(B)** the debtor "made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . ., and the debtor (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due," *see id*. § 513.44(a)(2) (the "constructive fraud" theory).

Although fraudulent transfer law usually applies to "suspicious midnight hour transfers," such as the Debtor who "sells" his friend his beach house on the eve of his bankruptcy filing, for virtually nothing in return, courts across the country have broadly applied fraudulent transfer law for the benefit of Ponzi Scheme victims, too. *See, e.g.*, *In re Petters Co., Inc.*, 499 B.R. 342, 355-59 (Bankr. D. Minn. 2013) (collecting cases). Consequently, in this case, the Trustee sought to recover interest payments made to investors/lenders like Defendants, on grounds that PCI made those "interest" payments to Defendants with an intent to defraud other creditors (*i.e.*, PCI knowingly paid the interest with other investors' money, rather than with revenue from the merchandise sales the loans

were purportedly funding), *and* without receiving a "reasonably equivalent value" in return for the interest payments (*i.e.*, the "loan" did not benefit PCI's business, but, rather, "merely depleted [its] resources faster"). *Id.* at 357 (quoting *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)); *see also supra* at 11-12 (noting PCI's gradually increasing insolvency from 1996 through 2008).

### 2. The Bankruptcy Court Denies the Trustee's Summary Judgment Motions En Masse, and Many "Petters Claw Back" Cases, Including This One, Are Transferred to the District Court for Trial

Following a lengthy and complicated discovery process, which resulted in numerous published decisions from the Bankruptcy Court, this Court, and the Eighth Circuit Court of Appeals, the Trustee brought summary judgment motions against many private investors, including Defendants, based on the fraudulent transfer theory outlined above. The Bankruptcy Court[10] entertained the first of these motions on March 5, 2018, in a case called *Kelley v. Charap*. (*See* Defs.' Ex. A [Doc. No. 113-1] ("Mar. 5, 2018 Bankr. Hr'g Tr.").) The Bankruptcy Court denied the Trustee's summary judgment motion from the bench, and then applied its oral ruling to the other at-issue "Petters claw black" adversary proceedings, including to the Trustee's action against Defendants. (*See* Defs.' Ex. C [Doc. No. 113-2] ("Mar. 20, 2018 Papadimos Summ. J. Ruling").)

As best this Court can tell, the Bankruptcy Court reached this decision for two reasons. First, the Bankruptcy Court found that material disputes of fact existed as to whether PCI acted with fraudulent intent with respect to each individual transfer the

---

[10] At this point, Chief Bankruptcy Judge Kathleen H. Sanberg.

Trustee sought to claw back (which, again, collectively totaled in the thousands). (*See, e.g.*, Mar. 5, 2018 Bankr. Hr'g Tr. at 75-76.) Although the Bankruptcy Court acknowledged the testimony of Ms. Coleman that "all of" the security agreements and purchase orders at issue were fabricated or exaggerated, the Court found that, at least in the case of Charap, the defendant-investor had rebutted that presumption of fraud by testifying that "he [was] not told that the loans were tied to specific deals, [and] did not rely on specific statements that tied the loans to specific deals." (*Id*. at 76; *see also id*. at 67 (noting that Charap had "testified that he would give [PCI] the money and it could be used for any purpose").) "There [were] no security agreements [with Charap]," the Bankruptcy Court added. (*Id*.)

Second, the Bankruptcy Court found that Martens's expert testimony did not sufficiently detail whether Defendants' money was used to finance legitimate merchandise transactions (as opposed to whether it was simply part of the "Ponzi churn"). (*See id*. at 77-78.) On this point, the Bankruptcy Court emphasized that, per Martens's own analysis, other Petters' companies "had legitimate business," and that PCI transferred "over a billion dollars" to those companies during the relevant time period. (*Id*.; *but cf. supra* at 13-14 (noting that this activity amounted to only three percent of PCI's total cash flow, and that Martens conducted an analysis with respect to these "intercompany" transfers).) Accordingly, the Bankruptcy Court reasoned, a reasonable juror could find that at least *some* of any individual investor's funds *may* have flowed to

legitimate, non-PCI transactions, and thus provided "reasonably equivalent value" to PCI.[11]

After reaching this decision, the Bankruptcy Court transferred many of the Petters claw back adversary proceedings before it to the District Court for trial (and/or further settlement negotiations). These cases were then distributed among the judges of the District.[12]

### 3. The Court Holds the First "Petters Claw Back" Jury Trial in Late 2018, in the Case of *Kelley v. Boosalis*; the Jury Rules for the Trustee

---

[11]  Based on the Bankruptcy Court's questioning, it also appears that, in divining the meaning of "value" in the Ponzi scheme context, the Court relied on a Colorado Court of Appeals decision holding that an (otherwise reasonable) loan to a firm engaged in a Ponzi Scheme could provide "reasonably equivalent value" to the firm based solely on the "time value of money." (*See, e.g.*, Bankr. Hr'g Tr. at 29.) However, a few months after the hearing, the Colorado Supreme Court overruled the Court of Appeals, and noted that the lower court's understanding of "reasonably equivalent value" conflicted with "the majority view in the federal courts," which focuses on whether an investor's "profits" stemmed "from an actual business venture," or whether they "merely" "deplet[ed] the debtor's assets under the guise of a profitable business." *Lewis v. Taylor*, 427 P.3d 796, 800 (Colo. 2018), *rev'g*, 2017 WL 526122 (Colo. Ct. App. 2017).

[12]  As of May 20, 2019, it appears that five Petters claw back proceedings remain pending before the District Court (excluding this case and the *Boosalis* case discussed *infra*). Two of these cases, *Kelley v. Charap* and *Kelley v. Johnson*, are set for trial later this year. (*See Kelley v. Charap*, No. 18-cv-687 (DSD/DTS) (trial set for Sept. 17, 2019); *Kelley v. Johnson*, No. 18-cv-895 (DSD/DTS) (trial set for June 3, 2019).) The remaining three cases are not currently set for trial. (*See Kelley v. Dovolis*, No. 19-cv-501 (DSD/SER); *Kelley v. Westford Special Situations Master Fund, LP*, No. 19-cv-1073 (ECT); *Kelley v. Hofer*, No. 18-cv-853 (NEB/DTS).)

Moreover, based on the parties' briefing and the Court's review of the docket, it appears that at least ten other Petters claw back proceedings remain pending before the Bankruptcy Court, and may ultimately be transferred to the District Court, too. (*Compare* Defs.' Summ. J. Br. at 24 *with* Pl.'s Br. in Opp. to Summ. J. [Doc. No. 114] ("Pl.'s Opp. Br.") at 16 n.7.)

Between November 26 and December 4, 2018, the undersigned presided over the first (and, to date, only) Petters claw back trial, in the case of *Kelley v. Boosalis. See* No. 18-cv-868 (SRN/TNL). Although the facts in that case differed in some ways from the facts here, the Trustee put on an affirmative case that largely mirrored what the Court set forth *supra* (albeit in a vastly more detailed fashion). For instance, Coleman provided factual testimony about PCI's fraudulent intent, and Martens provided expert testimony about how each one of the at-issue transfers directly played into the "Ponzi churn." The Trustee also put on four other witnesses, including an IRS agent, a PCI secretary, and a PCI tax accountant (the aforementioned James Wehmhoff). In his defense, Boosalis offered solely his own testimony.

Most importantly for present purposes, though, in the days before closing arguments, the Court had to resolve a legal dispute as to what the jury instruction defining "reasonably equivalent value" should say. The Trustee offered the following instruction, which the Court found to be an accurate statement of Minnesota law:

> Reasonably equivalent value may be found if the value Petters Company, Inc. received from Mr. Boosalis in exchange for a payment was reasonably equivalent to the value of the payment.

> Value may be reasonably equivalent where the payment made to the investor satisfies a valid antecedent debt. Any payment above the amount of the principal investment is not in satisfaction of a valid antecedent debt if it was made in furtherance of a fraud, enabled by a fraud, or paid on dishonestly-incurred debt. If you find that an interest payment made by Petters Company, Inc. to Mr. Boosalis was made in furtherance of a fraud, enabled by a fraud, or paid on dishonestly-incurred debt, then that payment does not satisfy a valid antecedent debt, and is not for reasonably equivalent value.

> (*See* Boosalis Doc. No. 111 at 14.)

Boosalis's counsel objected to this instruction, on grounds that it both conflicted with a recent Minnesota Supreme Court decision called *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015), and misstated the law of contract enforceability more generally. (*See* Boosalis Doc. No. 101.) Rather, Boosalis argued, the Court should excise any mention of "fraud" from its instruction, and should instead simply instruct the jury that "[v]alue may be reasonably equivalent where the payment is made to satisfy an antecedent debt," and that an "antecedent debt includes any legally enforceable right to payment against Petters Company, Inc." (*Id.* at 19.)

The Court overruled Boosalis's objection and maintained its original instruction. *See Kelley v. Boosalis*, 2018 WL 6322631 (D. Minn. Dec. 3, 2018); *see also* Boosalis Doc. No. 103. In its decision, the Court observed that, not only did Boosalis's instruction leave the jury to resolve the *legal* question of what constituted a "legally enforceable right to payment," but that, under Boosalis's proposed instruction, interest paid directly out of a Ponzi scheme could *always* be for "reasonably equivalent value," so long as it was received in good faith and in accordance with a facially legitimate contract. Because this reasoning lacked substantial legal support (including from the *Finn* decision, discussed *infra*), the Court instead concluded that the jury should be informed that, in accordance with prevailing legal standards, an interest payment received "in furtherance of a fraud, enabled by a fraud, or paid on dishonestly-incurred debt" did *not* constitute a "legally enforceable right to payment." From that premise, the Court reasoned, the jury could find no "*valid* antecedent debt," and, hence, no reasonably equivalent value, if it found that Boosalis's interest payments were "directly connected" to PCI's fraud. *Id.* at *4.

21

The jury returned a verdict in favor of the Trustee. (*See* Boosalis Doc. No. 116 (verdict form).) Specifically, the jury found that the Trustee had proven by a preponderance of the evidence that PCI made interest payments to Boosalis with an "intent to defraud" its other creditors, and that Boosalis had *not* proven by a preponderance of the evidence that he had accepted *any* of his interest payments in "good faith" or "in exchange for a reasonably equivalent value." (*Id.* (the "actual fraud" claim under MUFTA).) The jury also found that the Trustee had proven its "constructive fraud" claim by a preponderance of the evidence. (*See supra* at 16 (listing elements).)

The jury accordingly awarded the Trustee $3,502,455 in damages, *i.e.*, the interest that Boosalis had earned from his PCI loans. The Court later increased the Trustee's award to $6,382,144.71, in accordance with Minnesota's prejudgment interest statute. *See Kelley v. Boosalis*, 2018 WL 6433161, at *2-4 (D. Minn. Dec. 7, 2018) (granting the Trustee's motion for prejudgment interest under Minn. Stat. § 549.09); *see also* Boosalis Doc. No. 117, 124.

Boosalis appealed this judgment to the Eighth Circuit Court of Appeals. (*See* Boosalis Doc. No. 128.) In his appeal, Boosalis primarily focuses on the "reasonably equivalent value" controversy noted above. (*See* Boosalis App. Br. at 26-43, App. Docket No. 19-1079 (filed Apr. 9, 2019).)[13] The Eighth Circuit has yet to issue a decision on the matter.

---

[13] Boosalis also appealed this Court's rulings as to the existence of a predicate creditor, the meaning of "good faith" under MUFTA, and the proprietary of awarding prejudgment interest.

### 4. In Light of Certain Rulings from the *Boosalis* Trial, Both Parties Agree to File the Summary Judgment Motions at Issue Here

Defendants' trial was scheduled to occur shortly after the conclusion of the *Boosalis* trial. (*See* Doc. No. 97.) However, in a mutually-agreed-upon attempt to resolve certain threshold legal questions that might render a trial unnecessary, and thereby save all sides time and money, the parties requested the opportunity to file dueling summary judgment motions in lieu of an immediate trial. (*See* Doc. No. 99.) The Court granted the parties' request, and subsequently scheduled a summary judgment hearing. (*See* Doc. No. 101.)

The parties submitted full briefing on the matter shortly thereafter. (*See* Pl.'s Br. in Support of Summ. J. [Doc. No. 109] ("Pl.'s Summ. J. Br."); Defs.' Br. in Opp. to Pl.'s Summ. J. Mot. [Doc. No. 112] ("Defs.' Opp. Br."); Pl.'s Reply Br. [Doc. No. 116]; Defs.' Summ. J. Br.; Pl.'s Opp. Br.; Defs.' Reply Br. [Doc. No. 119].) The Court carefully considered the parties' briefing, and then entertained a lengthy oral argument on March 8, 2019. (*See* Doc. No. 123.)

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In considering whether to grant summary judgment, a court must not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007). However, "in order to defeat a properly supported motion for summary judgment," a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial," *Ingrassia v. Schafer*, 825 F.3d 891, 896

(8th Cir. 2016), and must not rely on "mere" "speculation" or "conjecture," *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014). Further, it is well established that "Rule 56 applies with equal force where the defendant resists summary judgment, especially where the defendant resists by asserting affirmative defenses which it has a burden to prove." *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 715 (8th Cir. 2004); *accord Residential Funding Co. v. Terrace Mortg. Co.*, 850 F. Supp. 2d 961, 964-65 (D. Minn. 2012).

Here, the parties dispute three key issues: *first*, whether the Trustee is entitled to summary judgment as to "actual fraud" under MUFTA, *second*, whether either party is entitled to summary judgment on Defendants' "reasonably equivalent value" defense to "actual fraud," and, *third*, whether Defendants' proposed questions about the meaning of "reasonably equivalent value" under MUFTA should be certified to the Minnesota Supreme Court. The Court will address each issue in turn.

## A. Actual Fraud

### 1. *The Law*

Under MUFTA and federal bankruptcy law, a debtor's pre-bankruptcy transfer is "fraudulent," and, hence, subject to "claw back," *if*, at the time of the transfer, the debtor "made the transfer . . . with *actual intent* to hinder, delay, *or defraud* any creditor of the debtor." Minn. Stat. § 513.44(a)(1) (emphasis added); *accord* 11 U.S.C. § 544(b). "Actual intent" can be shown in one of two ways.

First, it can be shown through "direct proof" of fraudulent intent. *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014).

Second, it can be shown through "badges of fraud" that provide circumstantial evidence of fraudulent intent. *Id.*; *accord Ritchie Capital Mgm't, LLC v. Stoebner*, 779 F.3d 857, 861-62 (8th Cir. 2015). Although MUFTA lists several specific "badges of fraud," *see* Minn. Stat. § 513.44(b), the list is not exclusive, and "[c]ourts may consider any factors they deem relevant to the issue of fraudulent intent," *Ritchie*, 779 F.3d at 863; *accord Finn*, 860 N.W.2d at 647 (affirming that "the list of badges of fraud is not exclusive"). If a party establishes "[t]he presence of several badges of fraud," that party is entitled to "an inference of fraud that requires clear evidence of a legitimate purpose to rebut." *Citizens Bank*, 849 N.W.2d at 66; *accord Kelly v. Armstrong*, 141 F.3d 799, 802-03 (8th Cir. 1998) (reversing district court for failing to instruct the jury as to this presumption). A party cannot rebut this inference merely by pointing to "legal formalities" accompanying their receipt of the at-issue money or property. *New Horizon Enters., Inc. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 15 (Minn. Ct. App. 1997) (collecting citations).

When "no genuine issue of material fact exists" with respect to fraudulent intent, a court may grant a party summary judgment on the issue. *Citizens Bank*, 849 N.W.2d at 66 (granting creditor summary judgment on "actual fraud," because it established fraudulent intent and the debtor "failed to rebut" that evidence); *see also Ritchie*, 779 F.3d at 866 (same); *Clarinda Color LLC v. BW Acquisition Corp.*, No. 00-cv-722 (JMR/FLN), 2004 WL 2862298, at *4 (D. Minn. June 14, 2004) (same).

Importantly, until 2015, Minnesota courts would "conclusively" presume fraudulent intent with respect to *any* pre-bankruptcy transfer made "in furtherance of a Ponzi scheme,"

so long as there was no dispute that a Ponzi scheme, in fact, existed. *Finn*, 860 N.W.2d at 647. However, in the aforementioned *Finn* case, the Minnesota Supreme Court rejected this categorical "Ponzi scheme presumption," and instead held that "fraudulent intent must be determined in light of the facts and circumstances of each case," and on a "transfer-by-transfer" basis. *Id*. In other words, "[t]he asset-by-asset and transfer-by-transfer nature of the inquiry under MUFTA requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Id*.[14]

However, the *Finn* court took care to note that "a court *could* make a rational inference from the existence of a Ponzi scheme that a particular transfer was made with fraudulent intent," and that its ruling only precluded a party from being "*relieved . . . of its burden* of proving—or for preventing the transferee from attempting to disprove— fraudulent intent." *Id*. (emphasis added). Indeed, following a thorough analysis of the *Finn* decision, Judge Kishel determined (in convincing manner) that a party in the Trustee's position could prove fraudulent intent by (a) "plac[ing] the transfer he would have avoided, into a chain of successive investment transactions that involved similar acts of fraudulent

---

[14]     This conclusion appeared to flow from the Supreme Court's observation that Ponzi schemes can take "a multitude of different forms," and that, consequently, "not every Ponzi scheme lacks a legitimate source of earnings." *Id*. at 646, 652; *see also id*. at 649 (noting that "it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud," or who has "assets or legitimate business operations aside from the Ponzi scheme"). For instance, in *Finn*, the at-issue debtor arguably lacked fraudulent intent when making at least one of the pre-bankruptcy interest payments sought to be clawed back, because the payments indisputably came from a *legitimate* business transaction, not from the "Ponzi churn." *See id*. at 643, 655.

inducement by the Debtors, as to successive investors," and, (b), showing "the successive misdirection of investors' cash infusions toward the payment of earlier investments rather than the application to investment opportunities of the sort fraudulently represented." *In re Petters Co. Inc.*, 550 B.R. 457, 481-82 (Bankr. D. Minn. 2016); *see also id.* at 467-69 (providing close analysis of *Finn* on this issue).

### 2. *Analysis*

The Trustee is entitled to summary judgment on this issue. This is so for three reasons. **First**, the Trustee has provided substantial "direct proof" of PCI's intent to defraud, on a transfer-by-transfer basis, and in the manner contemplated by Judge Kishel. **Second**, under a "badges of fraud" analysis, the Trustee has also proven its entitlement to an inference of fraudulent intent. **Third**, Defendants have not set forth any evidence, beyond the speculative, from which a reasonable juror could rebut the Trustee's proof of actual fraud.

**First**, the testimony of Deanna Coleman directly shows that PCI intended to defraud its future (and current) creditors when it made the at-issue interest payments to Defendants. That is, Coleman's testimony shows that, from 1994 through 2008, PCI *intentionally* lured investors to lend it money by promising "security interests" in merchandise that did not, in fact, exist, and then *intentionally* kept those investors coming back by paying them interest with *other investors' money* (who similarly believed they were investing in "securitized" merchandise orders). (*See supra* at 8-10.) Because PCI applied this fraud scheme through thousands of promissory notes and security agreements, Coleman (understandably) could not testify as to PCI's intent at the exact moment of each of the 100-some transfers at issue

27

here. However, Coleman has testified (repeatedly and consistently) that she was responsible for drafting the promissory notes, security agreements, and purchase orders that undergirded each of the at-issue transfers, and that, from 1994 onwards, "*every* purchase order that [an] investor received or invested in was fake." (Coleman Dep. I at 88 (emphasis added).) Indeed, all of the security agreements in the record, from 1997 onwards, contain the same fraudulent misrepresentation that Coleman would make to Papadimos when she "called him up and asked for" a loan (*id.* at 193-94), namely, that PCI needed Papadimos's (or his wife's) money so that PCI could "acquire rights in or use of certain merchandise," and then "resell [that merchandise] as part of [PCI's] business." (*Supra* at 6-7; *see also* Papadimos Dep. I at 84 (noting that these purchase orders and security agreements constituted an "important factor" in encouraging him to invest with PCI).)

Moreover, what Coleman asserts on a general basis, Martens (the forensic accountant) confirms on a transfer-by-transfer basis. That is, as contemplated by Judge Kishel, Martens analyzed each transfer at issue here, and, in so doing, found that PCI did exactly what Coleman claimed it did: (a) used fraudulent security agreements and promissory notes to "induce" Defendants to lend money; (b) "misdirected" Defendants' "cash infusions toward the payment of earlier investments," rather than to investments in real merchandise; and (c) paid Defendants' interest with funds provided by "the successive misdirection" of subsequent investors' cash, rather than from revenue realized as a result

of real merchandise re-sales. (*See supra* at 12-14; *accord In re Petters Co. Inc.*, 550 B.R. at 481-82.) This is, simply put, an overwhelming showing of direct fraudulent intent.[15]

**Second**, to the extent PCI's intent with respect to any particular interest payment to Defendants is unclear, a "badges of fraud" analysis further buttresses Coleman's account, and Martens's accounting. Specifically, the Court finds that three, glaring "badges of fraud" accompanied the at-issue transfers, and that, when viewed in conjunction with the "direct" evidence outlined above, entitle the Trustee to "an inference of fraud" with respect to each of those transfers. *Citizens Bank*, 849 N.W.2d at 66.

*First*, in light of Coleman and White's guilty pleas, and Petters's conviction following a month-long trial, there can be no serious dispute that PCI was, in fact, conducting a Ponzi scheme at the time of the transfers, with the goal of defrauding investors. (*See supra* at 10; *accord Finn*, 860 N.W.2d at 654 (noting that being convicted of "operat[ing] a Ponzi scheme to defraud" investors could constitute a "badge of fraud").)

*Second*, in light of Martens's thorough insolvency report, there can also be no serious dispute that PCI was insolvent at least six months before Papadimos first lent PCI money in 1997, and that PCI fell deeper and deeper into insolvency as Defendants lent more and more money to the company. (*See supra* at 11-12; *accord* Minn. Stat. §

---

[15]    In fact, in neither their opposition brief nor at oral argument did Defendants attempt to rebut *any* of this direct evidence, other than to cursorily suggest that a jury might not believe Coleman or Martens's testimony. (*See, e.g.*, Mar. 8, 2019 Hr'g Tr. at 47 (noting that Coleman is a "convicted" "fraudster").) Under the circumstances, this kind of vague credibility argument is not enough to create a "genuine" dispute of material fact. *Ingrassia*, 825 F.3d at 896; *cf. supra* at 18 (noting that the Bankruptcy Court denied summary judgment when a defendant-investor had pointed to specific record testimony that could be construed as contradicting the Trustee's evidence of fraudulent intent).

513.44(b)(9) (whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred" is indicative of actual intent to defraud); *Ritchie*, 779 F.3d at 865 (same, and describing "insolvency" as "among the more common badges of fraudulent intent").)[16]

*Third*, the undisputed evidence shows that, at the time of the interest payments, PCI's leaders were actively working to conceal critical information about the payments, and about PCI's finances more generally, from their outside creditors. (*See supra* at 10-11; *accord In re Bayou Grp. LLC*, 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007) (describing the "intentional[] disseminat[ion] [of] false financial statements and performance reports" as a "badge of fraud"); *cf.* Minn. Stat. § 513.44(b)(9) (whether "the transfer or obligation was disclosed or concealed" indicative of actual intent to defraud).[17]

---

[16]     Martens's analysis accords with *Finn*'s holding that insolvency cannot be *presumed* merely by the existence of a Ponzi scheme. *See Finn*, 860 N.W.2d at 648-49. Martens's conclusions, as set forth in his expert report, are backed by evidence, not supposition. Indeed, Defendants do not dispute Martens's analysis in any substantial way. (*See* Defs.' Opp. Br. at 5-6.) Rather, Defendants simply rely on the unadorned assertion that Martens's analysis must be discounted because "Martens did not conduct a transfer by transfer based insolvency analysis." (*Id.* at 6.) However, as Judge Kishel explained in his opinion analyzing *Finn*, such an analysis is not required under the circumstances. *Compare In re Petters Co. Inc.*, 550 B.R. at 470 ("If the Trustee's forensic reconstruction for the history of individual Debtor-transferors shows that they *slipped into balance-sheet insolvency . . . at a specific point in history and never emerged to solvency*, that will be enough [to show insolvency for fraudulent transfer purposes].") (emphasis added) *with supra* at 11-12 (showing that PCI "slipped into balance-sheet insolvency" by December 31, 1996 and "never emerged to solvency" thereafter).

[17]     The Court acknowledges that, in the standard issue fraudulent conveyance action, the transfer *itself* is being "concealed" from other creditors, and that that was not the case here. (*See* Defs.' Opp. Br. at 6-7 (noting that "many of the transfers were recorded with the Secretary of State of Minnesota by way of UCC filings").) However, given the flexibility of the "badges of fraud" analysis, the Court nonetheless finds that PCI's

In sum, these three, essentially undisputed, badges of fraud (along with the direct evidence outlined above) provide compelling circumstantial evidence that PCI "made the transfer[s] . . . with actual intent to . . . defraud" its other creditors, *i.e.*, "present investors who were induced to continue their investments [with PCI *and* prospective investors which the principals of [PCI] hoped to and did induce to invest in [PCI] in the future." *In re Bayou Grp.*, 362 B.R at 634 (emphasis added). As such, the Trustee is entitled to "an inference of fraud" with respect to each of the at-issue transfers. *Citizens Bank*, 849 N.W.2d at 66

**Third**, and finally, Defendants have provided no evidence, much less "clear evidence," that PCI had a "legitimate," non-fraudulent "purpose" in making any of the at-issue interest payments to them. *Citizens Bank*, 849 N.W.2d at 66. As noted above, the overwhelming evidence in this case shows that Defendants were intentionally repaid with other investors' money, not with proceeds from actual merchandise sales or with revenue from other, "legitimate" Petters ventures. *Compare with Stoebner v. Opportunity Finance, LLC*, 909 F.3d 219, 226 (8th Cir. 2018) (in a claw-back case involving pre-bankruptcy interest payments made by Petters Consumer Brands ("PCB"), one of Petters's "legitimate" companies, finding no "fraudulent intent" on PCB's part because the trustee's complaint affirmatively conceded that PCB "repa[id] the loans through the proceeds of 'real life' transactions"). Although Defendants vaguely suggest that they *might* have been repaid with "legitimate business income," based on the (relatively small) transfers between PCI and

---

widespread concealment of important financial information constitutes a compelling "badge of fraud."

other Petters's entities, they offer no concrete *evidence* in support of this claim, and do not even acknowledge that Martens conducted a thorough analysis on this very issue. (*Compare* Defs.' Opp. Br. at 12-14 *with supra* at 13-14.) In other words, Defendants' case against a finding of fraudulent intent consists entirely of a case against Martens, and Defendants' case against Martens consists entirely of "speculation," "conjecture," and "attorney argument." That is not enough to send this issue to a jury. *See Holaway*, 771 F.3d at 1059; *see also Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 838 (8th Cir. 2006) ("[A]rguments of counsel are not evidence.").

The Court emphasizes that it reaches this conclusion without considering the credibility of either Coleman or Martens, *see Thomas*, 483 F.3d at 526, and without relying on a "Ponzi scheme presumption," *see Finn*, 860 N.W.2d at 647. Rather, the Court has examined the evidentiary record, and has determined that, even when all reasonable inferences are drawn in Defendants' favor, there is simply no evidence, much less the kind of "transfer-specific" evidence contemplated by *Finn*, from which a reasonable jury could find in Defendants' favor on the issue of fraudulent intent. *Compare with Finn v. Moyes*, No. 14-cv-1293 (JRT/TNL), 2017 WL 1194192, at *13 (D. Minn. Mar. 30, 2017) (determining that dispute existed as to the "legitimacy" of a particular at-issue transfer because Defendants provided evidence that that transfer was part of a "settlement agreement," rather than part of an underlying fraudulent scheme).

For these reasons, the Court finds that, with respect to each at-issue, pre-bankruptcy transfer from PCI to Defendants, the Trustee is entitled to summary judgment as to "actual fraud."[18]

## B. Reasonably Equivalent Value Defense

In light of this ruling on "actual fraud," the question now becomes whether a reasonable juror could find that Defendants have met *their* burden of proving that any of their loans provided PCI with a "value" "reasonably equivalent" to the interest payments they received in exchange for the loan. *See* Minn. Stat. § 513.48(a).[19]

### 1. *The Law*

Before analyzing what evidence Defendants have offered in support of their burden, the Court must first address the threshold legal question of what constitutes "reasonably equivalent value" under MUFTA. As in *Boosalis*, this question lies at the heart of the parties' dispute.

The Court begins by noting four principles that all parties agree upon.

---

[18]     It is undisputed that the Trustee has identified a "predicate creditor" under 11 U.S.C. § 544(b). *See In re Marlar,* 267 F.3d 749, 753 (8th Cir. 2001) ("To exercise her § 544(b)(1) avoidance power, the trustee must show that the transfer is voidable under state law by at least one unsecured creditor of the bankruptcy estate with an allowable claim."). As the Trustee's brief explains, that "predicate creditor" is Interlachen Harriet Investments Limited. (*See* Pl.'s Summ. J. Br. at 19-21.)

[19]     The Trustee has stipulated, for purposes of this motion, that Defendants transacted with PCI "in good faith," and could thus prove the other element of the statutory defense to "actual fraud." (*See* Pl.'s Summ. J. Br. at 27.)

*First*, under Minnesota law, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation . . . an *antecedent debt* is . . . satisfied." Minn. Stat. § 513.43(a) (emphasis added).

*Second*, in the usual course of business, repaying a loan, or "antecedent debt," at a reasonable interest rate, prior to a bankruptcy, provides value to the payee because it eliminates a debt for which the payee (or their successors) otherwise would have been liable. *See, e.g.*, *In re Duke & King Acquisition Corp.*, 508 B.R. 107, 146 (Bankr. D. Minn. 2014) (Kishel, C.J.,) (noting that, when there is "no allegation" of "fraud" or "collusion," "courts uniformly recognize that reduction of preexisting debt, dollar-for-dollar in proportion to the amount of payment, gives a reasonable equivalence to the transfer; and hence the payment is sheltered from avoidance"). This is so even if the business is re-paying that loan while it is in financial distress, and its repayment preferences one creditor at the expense of others. *See, e.g.*, *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005) (emphasizing that, absent evidence of a Debtor's fraudulent intent, a satisfied lender who "loaned money to [the Debtor] at the market price, in the ordinary course of its business . . . is presumptively entitled to keep the repayment").

*Third*, however, in the specific context of a Ponzi scheme, there is a long line of federal bankruptcy cases (most of which interpret materially identical state fraudulent transfer statutes) holding that the "interest," or "profits," received by a party directly investing into a Ponzi scheme are *not* in exchange for "value," much less "reasonably equivalent value." *See, e.g.*, *Perkins v. Haines*, 661 F.3d 623 (11th Cir. 2011); *Donell v.*

*Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Sender v. Buchanan (In re Hedged–Investments, Assoc., Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996); *Scholes v. Lehmann,* 56 F.3d 750, 757–58 (7th Cir. 1995); *In re Consolidated Meridian Funds*, 487 B.R. 263 (Bankr. W.D. Wash. 2013); *In re Madoff Inv. Secs. LLC*, 454 B.R. 317 (Bankr. S.D.N.Y. 2011); *In re Indep. Clearing House Co.*, 77 B.R. 843, 858 (Bankr. D. Utah 1987); *cf. Lewis v. Taylor*, 427 P.3d 796, 801-02, n.4 (Colo. 2018) (agreeing with this case law for purposes of "equity-based Ponzi schemes," but declining to reach a ruling with respect to "fixed-income Ponzi schemes," like the one at issue here). This is so, these courts hold, because the Ponzi scheme operator is not simply paying back a business debt that it otherwise would have been liable for (which would benefit the corporation). Rather, the operator is conferring "profits" on an investor with *other investors'* money (*not* legitimate business revenue), in a scheme that inevitably results in the last set of investors losing *all* of their money and then discovering that those earlier "investments" financed *no* tangible assets from which they could collect payment. *See Donell*, 533 F.3d at 770 ("[P]rofits gained through theft from later investors are not a reasonably equivalent exchange for the winning investor's initial investment."); *Scholes*, 56 F.3d at 757 ("The paying out of profits to [a defendant investor] not offset by further investments by him conferred no benefit on the [Debtor] but merely depleted [its] resources faster."). As such, these courts have reasoned, although a "winning" investor is entitled to keep their *principal* investment into a Ponzi scheme (because they have a right to receive what they initially put into the scheme, as a matter of restitution), this entitlement does not extend to

"profits" (in an equity-based Ponzi scheme) or "interest payments" (in a fixed-income Ponzi scheme).[20]

*Fourth*, prior principle notwithstanding, under MUFTA, a Ponzi scheme operator's repayment of a loan (with interest) "*can* constitute reasonably equivalent value," if that "antecedent debt" was repaid pursuant to a "*legally enforceable*" contract against the scheme's operator. *Finn*, 860 N.W.2d at 650-51 (emphasis added). Specifically, *Finn* held, based on the facts before it, a party that loans money to a Ponzi scheme operator acted pursuant to a "legally enforceable" contract, and hence provided "reasonably equivalent value," *if* their loan was for a reasonable interest rate, financed an "actual" business transaction, and was then repaid with "real" money flowing from that transaction. *Id*. at 652, 655-56; *see also supra* n.14. In other words, *Finn* ruled, there is no presumption under MUFTA that *every* lending contract entered into with a Ponzi scheme operator is invalid, and hence unable to provide "reasonably equivalent value" to the operator. *See Finn*, 860 N.W.2d at 655 ("Because we have already rejected a rule requiring us to invalidate *all* contracts made with a Ponzi-scheme operator, and the Receiver essentially provides no reason to invalidate the [at-issue lending contract] other than the fact it was a part of a greater Ponzi scheme, we conclude that the satisfaction of

---

[20] Although not relevant here, the Court notes that this theory of liability focuses on individuals who invest into the Ponzi churn itself; it may not apply to parties who provide "consumable goods or services" to a Ponzi scheme operator prior to their bankruptcy. *See, e.g.*, *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 575, 581-82 (Tex. 2016) (holding that, although millions of dollars of payments from Ponzi scheme operator to the Golf Channel for advertising time might have helped further the Ponzi scheme, the payments were in exchange for "reasonably equivalent value," *i.e.*, "advertising *services*," and were therefore not subject to claw back).

[the lender's] antecedent debt constituted 'value' under MUFTA.") (emphasis added); *cf. id*. at 649 (noting that "it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud," or who has "assets or legitimate business operations aside from the Ponzi scheme").

Disagreement arises, however, as to how one should interpret these four principles. In the Trustee's view (which this Court adopted in *Boosalis*), these four principles stand for the proposition that not "*all* contracts between a Ponzi scheme operator and an investor are unenforceable as a matter of public policy, as [that] would deprive the investor of an opportunity to prove that its contract was outside the Ponzi scheme and therefore legally enforceable." (Pl.'s Reply Br. at 8; *accord Kelley v. Boosalis*, 2018 WL 6322631, at *2-3.).) But, the Trustee continues, if the evidence definitively shows that a lending contract was "in furtherance of" the "fraudulent" Ponzi churn, that contract is *not* enforceable, under either *Finn* or the longstanding federal bankruptcy case law cited above. (*See* Pl.'s Summ. J. Br. at 27-28.) In other words, the Trustee argues, *Finn* did not outright reject the prior law concerning the unenforceability of Ponzi scheme "profits." Rather, *Finn* merely sought to limit any "presumptions" arising out of that case law, so as to align Ponzi scheme claw back cases with MUFTA's individualized, "transfer by transfer" mode of analysis, and with MUFTA's focus on combating "fraudulent" transfers, rather than mere "preferences" to "bona fide" creditors. *See Finn*, 860 N.W.2d at 647; *see also id*. at 653 ("MUFTA does not prohibit a debtor from making a preferential transfer in favor of one bona fide creditor over another, *so long as the transfer is not fraudulent*.") (emphasis added). What's more, the Trustee adds,

37

because "interest payments" arising out of a Ponzi churn "aim to deceive a third party," *i.e.*, other investors, the payments are also unenforceable as a matter of black letter contract law. (*See, e.g.*, Pl.'s Opp. Br. at 8-9 (collecting cases finding a contract "void" because it "ha[d] for its object the practice of deception upon a third party"); *Kelley v. Boosalis*, 2018 WL 6322631, at *4 (same); *cf. Finn*, 860 N.W.2d at 651 ("[A]ny *legally enforceable* right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA.") (emphasis added).)

Defendants disagree with this interpretation. In their view, *Finn did* reject the prior case law concerning the unenforceability of Ponzi scheme "profits," and that this Court was wrong to assume otherwise in *Boosalis*. (*See, e.g.*, Defs.' Summ. J. Br. at 11, 14.) Instead, Defendants argue, *Finn* stands for the proposition that *any* interest payments received from a Ponzi scheme operator are in exchange for "reasonably equivalent value," so long as the payments are pursuant to reasonable interest rates and in accordance with a facially legitimate promissory note, just as the payments would be in the non-Ponzi scheme context. (*Id.*; *see also In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002) (adopting this argument, in direct contravention of the majority view of federal courts); *In re Unified Commercial Capital*, 160 B.R. 343 (Bankr. W.D.N.Y. 2001) (same).) Moreover, Defendants contend, so long as there is no allegation that a lender knowingly participated in the Ponzi scheme, lending contracts with a Ponzi scheme operator *are* enforceable as a matter of black letter contract law, and hence provide "reasonably equivalent value" under the reasoning of *Finn*. (*See* Defs.' Summ. J. Br. at 10-14; Defs.' Reply Br. at 5-8.) This is so, the argument goes, because, as

a general matter, a contract between an innocent party and a criminal counterparty is enforceable against the counterparty *even if* the counterparty uses the contract for an illegal purpose. (*Id.* (citing, *e.g.*, *Anheuser-Busch Brewing Assn. v. Mason*, 46 N.W. 558, 558 (Minn. 1890) (upholding beer salesman's contract to sell beer to owner of an (illegal) brothel, and noting that a contract is "not void simply because there is something immoral or illegal in its surroundings or connections").) In other words, Defendants assert, if an innocent investor "had sought to enforce their Notes against" the Ponzi scheme operator prior to the bankruptcy proceeding, the scheme operator could not have argued that "its own illegal use of funds loaned by [the innocent investor] rendered the Notes invalid." (Defs.' Reply Br. at 7 (citing, *e.g.*, *Eagle Roller-Mill Co. v. Dillman*, 69 N.W. 910, 911 (Minn. 1897) (holding that a contract is not void if the alleged "illegal act" that the contract was connected to did "not form any link in plaintiff's chain of title to [the property] or the money, or constitute any part of its cause of action").)

After careful consideration of Defendants' arguments and cited legal authority, the Court re-affirms its position, and declines to reconsider its Order (and accompanying jury instruction) from *Boosalis. See generally Kelley v. Boosalis*, 2018 WL 6322631. As such, rather than repeat what it said in that Order, the Court will simply address the two key counterarguments raised by Defendants in their briefing here, and will explain why it finds neither of those arguments availing.

***First***, the Court cannot agree that *Finn* "rejected" the logic of the prior federal bankruptcy case law *in toto*. (*See, e.g.*, Defs' Reply Br. at 3-4 (arguing that *Finn* "rejected" the Seventh Circuit's decision in *Scholes v. Lehmann*).) It is true, of course,

that the *Finn* court found that some of those decisions went too far in "presuming" the key elements of a fraudulent transfer claim based *solely* on the fact that a party gave money to a Ponzi scheme operator, and in holding that "equality of distribution" constituted the *sine qua non* of state fraudulent transfer statutes. *See, e.g.*, *Finn*, 860 N.W.2d at 652 (noting that "equality among a debtor's creditors, even if they are victims of a Ponzi scheme, is *not* the purpose of MUFTA," rather, "it is to 'prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors'") (quoting *In re Butler*, 552 N.W.2d 226, 232 (Minn. 1996)).

However, as Judge Kishel observed, following an exhaustive examination of *Finn* and all of the case law upon which *Finn* relied, "*Finn* . . . gives no reason to deny the continuing vitality of *Scholes v. Lehmann*," and the other, equity-driven federal bankruptcy case law cited above, especially with respect to payments made "in the thick of a Ponzi scheme." *In re Petters Co., Inc.*, 550 B.R. at 481. This is so because "however much [*Finn*] jibes at several of the foundational principles of [the federal bankruptcy] analysis . . . *Finn* does so only in the service of one end: rejecting the Ponzi scheme presumption as to reasonably equivalent value," and, perhaps more importantly, "only in a case brought on facts where a finding of reasonably equivalent value would have been amply supported outside of the context of receivership or bankruptcy." *Id*. In other words, "*Finn* says nothing about the alternative situation in the thick of a Ponzi scheme." *Id*. Moreover, Judge Kishel noted, all of the Minnesota case law *Finn* cited in support of the notion that a pre-bankruptcy transfer provides value if it "satisif[ies] some kind of legitimate preexisting debt" consistently "excluded" transfers made through "intentional

wrongdoing, dishonesty or fraud of some sort." *Id.* at 473 (collecting citations). As such, Judge Kishel concluded, "[t]here is still a viable theory for an equitable override that denies value to the interest component of repayment on debt owing by the perpetrator of a Ponzi scheme, incurred in transactions in the main sequential operation of the scheme, in an action for avoidance under MUFTA." *Id.* at 481.

The Court concurs in this assessment, as it implicitly did in *Boosalis*, and therefore finds that the federal bankruptcy law cited above remains persuasive in the present context, as do their holdings concerning the unenforceability of "profits," or "interest," paid directly out of a "Ponzi churn."[21]

***Second***, the Court also disagrees that, as a matter of black letter contract law, a lender has a "legally enforceable" right to receive interest paid out of a Ponzi scheme, simply because they did not knowingly participate in the Ponzi scheme themselves. *Finn*, 860 N.W.2d at 651. As the Court explained in its *Boosalis* order, "a contract that aims to deceive a third party is void" as against public policy, and, in a Ponzi scheme, contractual

---

[21]     What's more, *Finn* in no way suggested that it was adopting the minority federal court view, in which interest payments made pursuant to a Ponzi scheme are enforceable, and hence not subject to claw back, so long as the payments were made pursuant to a facially legitimate promissory note, and at a reasonable interest rate. (*See supra* at 38 (citing *In re Carrozzella & Richardson* and *In re Unified Commercial Capital*).) Not only are these cases clear "outliers" among judicial authorities, *see, e.g.*, *Silverman v. Cullin*, 633 Fed. App'x 16, 17 (2d Cir. 2016) (describing these two cases as "outliers"), but the Court finds that adopting this position would effectively create a conclusive presumption *against* creditors (or bankruptcy trustees) trying to "claw back" interest payments made out of a "fixed-income Ponzi scheme," no matter how directly connected those payments/promissory notes were to a fraud. Such a "presumption" would no more accord with *Finn* than the countervailing "Ponzi scheme presumption" the Minnesota Supreme Court rejected.

payments of interest to an investor (with other investors' money) plainly "aim to deceive a third party," *i.e.*, those other investors whose money is being misused. *Kelley v. Boosalis*, 2018 WL 6322631, at *4. Although Defendants correctly note that the cases the Court cited in its *Boosalis* Order involved contracts between two parties *jointly* aiming to deceive a third party (*see* Defs.' Opp. Br. at 10-11), the Court declines to imply a strict *mens rea* requirement from that case law, as the "void against public policy" doctrine is not dictated by enumerated, categorical criteria. Rather, the Minnesota Supreme Court has held that a contract is void against public policy if "it is injurious to the interests of the public or contravenes some established interest of society," or if "illegality has so tainted the contract that enforcing the contract would be against public policy." *Isle Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 93 (Minn. 2006) (cleaned up).

Applying these broad principles, then, and in light of the longstanding federal bankruptcy case law discussed above, the Court can only conclude that an investor who profits from a Ponzi scheme, even if an "unwitting accomplice" to fraud against a third party, does not have a contractual right to keep interest payments made as a direct result of that illegal scheme. *See Scholes*, 56 F.3d at (noting that an investor who profits from a Ponzi scheme has no "moral claim to keep his profit" because he was an "unwitting accomplice" in keeping the fraud "going longer," so as to increase "the losses to the [other] investors"); *cf. Zayed v. Buysee*, No. 11-cv-1042 (SRN/FLN), 2012 WL 12893882, at *37 (D. Minn. Sept. 27, 2012) (holding, in the unjust enrichment context, that lending contracts with a Ponzi scheme operator were "void" because "they were procured by fraud and perpetuated a fraud").

Admittedly, the Court is reluctant to find promissory notes void, even partially, on this "public policy" basis, as "a court's power to declare a contract void for being in contravention of public policy is a very delicate and unrefined power," and "should only be exercised in cases free from doubt." *Katun Corp. v. Clarke*, 484 F.3d 972, 976 (8th Cir. 2007) (citing *Hollister v. Ulvi*, 271 N.W. 493, 498-99 (Minn. 1937)). However, under the unique circumstances presented by a proven Ponzi scheme, the Court finds that Minnesota law requires the "freedom of contract" to give way to a "principle which is of even greater importance to the general public," namely, the disgorgement of "profits" directly procured through fraud, deception, and other illegal conduct. *See Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014) (observing that "Minnesota public policy favors the freedom to contract," "*except . . .* when the particular contract violates some principle which is of even greater importance to the general public") (emphasis added) (cleaned up).

Defendants' cited cases do not convince the Court that it must conclude otherwise. All of Defendants' cases involved fact patterns in which the at-issue contract was only tangentially connected to illegal or fraudulent behavior, or where a party's claim to payment could be asserted without any reference to illegal activity. *See, e.g.*, *Booshard v. Steele Cty.*, 217 N.W. 354, 354 (Minn. 1927) (holding that, although defendant attempted to defend against plaintiff's right to payment by arguing that plaintiff had forfeited that right through an (admittedly illegal) "side agreement," plaintiff could still recover because he established liability completely "independent of the illegal contract"); *Disbrow v. Creamery Package Mfg. Co.*, 125 N.W. 115, 118-19 (Minn. 1910) (finding

that, although plaintiff and defendant had conspired to "fraudulently obtain" patents on some occasions, a court could still enforce an earlier, "perfectly valid agreement" between the parties because the earlier contract was "not dependent upon an illegal or unlawful transaction"); *Eagle Roller-Mill*, 69 N.W. at 911-12 (holding that defendant-employee could not defend against his breach of a "perfectly valid" employment contract (the embezzlement of grain from the plaintiff-employer) by pointing to unrelated illegal activity by the plaintiff-employer, because that illegal activity in no way affected the employer's "chain of title to the grain"); *Anheuser-Busch*, 46 N.W.2d at 558 (holding that court would enforce sale of beer from retailer to owner of (illegal) brothel, because the sale of "proper article[s] of merchandise in a legitimate way" to an illegal enterprise "merely . . . tend[ed] to promote illegal or immoral purposes," and in no other way connected the retailer "with any violation of the law").

In a "Ponzi churn" case, by contrast, the Ponzi scheme operator's "performance" of their end of a "lending contract" *only* occurs because they steal money from other investors, by way of fraudulent inducement, which, in turn, encourages the counterparty to the contract (and others) to continue contributing money to the illegal scheme. Such a "lending contract" does not "merely . . . *tend* to promote illegal or immoral purposes," it *is* what makes a Ponzi scheme "illegal" and 'immoral" in the first place. *Id.* (emphasis added).

For these reasons, the Court finds that the correct legal interpretation of "reasonably equivalent value" is the jury instruction it gave in *Boosalis*. And, there, it instructed the jury that "[v]alue may be reasonably equivalent where the payment made

to the investor satisfies a valid antecedent debt," but that "any payment above the amount of the principal investment is not in satisfaction of a valid antecedent debt if it was made in furtherance of a fraud, enabled by a fraud, or paid on dishonestly-incurred debt." (Boosalis Doc. No. 111 at 14.)

### 2. *Analysis*

With the legal question settled, the application of law to fact in this case becomes relatively straightforward. That is, just as Defendants failed to adduce evidence showing that PCI might have had a "legitimate" intent with respect to some of the at-issue interest payments (*see supra* at 31-33), Defendants failed to adduce evidence showing that any one of their interest payments was *not* "made in furtherance of a fraud, enabled by fraud, or paid on dishonestly-incurred debt," (Boosalis Doc. No. 111 at 14). Accordingly, Defendants' interest payments were not "in satisfaction of a valid antecedent debt," and did not provide "reasonably equivalent value" to PCI. (*Id.*)

Admittedly, Defendants did submit some expert testimony suggesting that the interest rates on their loans were "reasonable," given the "high risk" of "this type of financing." (Defs.' Summ. J. Br. at 6-7 (describing testimony of Matthew Polsky).) The Trustee did not address this evidence in its briefing in any substantial manner. However, the Court finds that, because Defendants failed to show that their promissory notes were in exchange for non-fraudulent business purposes, the Court need not consider the reasonableness of the interest rate attached to the notes.

The Court also acknowledges that, were there evidence that Defendants' "promissory notes" were intended to function as "general business loans" to PCI, this

case might present a closer call on "reasonably equivalent value." In that scenario, a lender could perhaps argue that interest payments on their loans were in exchange for "value," in the sense that the loans were intended to be spent on employee salaries and building rent and the like, and were therefore not "directly connected" to a Ponzi scheme operator's fraud. *See Kelley v. Boosalis*, 2018 WL 6322631, at *4 (distinguishing between "promissory notes . . . tangentially connected to the fraud" and those "directly connected to it"). However, this is not such a case. As detailed above, the vast majority of Defendants' promissory notes were executed in connection with indisputably fraudulent security agreements and purchase orders (*see supra* at 6-7), and were not, in any way, connected to "real" diverting activity. *Cf. Finn*, 860 N.W.2d at 652 ("[T]here is [] no dispute that the banks in this case purchased non-oversold participation interests in *actual* loans to *real* borrowers, which provided [the Ponzi scheme operator] with a legitimate source of earnings with which to pay the banks."). Consequently, any further refining of the law, with respect to the meaning of "reasonably equivalent value" in the lending context, will await another day, when more nuanced fact patterns emerge than the one at issue here.

Finally, the Court acknowledges that the Bankruptcy Court denied the Trustee summary judgment on the question of "reasonably equivalent value" earlier in this litigation. (*See supra* at 18-19.) Upon close examination of the Bankruptcy Court's reasoning, though, it appears that the Bankruptcy Court took this action because it found that the Trustee had failed to meet *its* burden on the issue, as is the case in the "constructive fraud" context. (*See, e.g.*, Mar. 5, 2018 Bankr. Hr'g Tr. at 78.) Because this

Court, unlike the Bankruptcy Court, has found that the Trustee is entitled to summary judgment on "actual fraud," and that therefore it is *Defendants'* burden to prove "reasonably equivalent value," the Court finds this case distinguishable from that earlier decision. *See Residential Funding Co.*, 850 F. Supp. 2d at 965 (emphasizing that "one who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment *must* adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense") (emphasis added) (cleaned up).

For these reasons, the Court grants the Trustee summary judgment as to Defendants' affirmative defense of "reasonably equivalent value."

## C. Certification

Defendants next argue that, in the alternative, this Court should certify the following two "unsettled" legal questions to the Minnesota Supreme Court, in lieu of a definitive ruling on "reasonably equivalent value" here:

(1) Under MUFTA, is a promissory note given in exchange for a loan legally unenforceable because the borrower operated a Ponzi scheme and employed the borrowed funds in the operation of its Ponzi scheme?

(2) Under MUFTA, does the repayment of interest that an entity is contractually required to pay under the terms of an agreement whereunder funds were borrowed constitute the repayment of antecedent debt?

Because the Court has already rejected Defendants' arguments with respect to both questions, there is no "unsettled" question of state law that the Court need certify to the Minnesota Supreme Court. However, for the sake of thoroughness, the Court will briefly

review the law of certification, and will explain why, prior ruling notwithstanding, certification is still unnecessary here.

## 1. *The Law*

The Minnesota Supreme Court "may answer a question of law certified to it by a" federal District Court like this one, "if the answer may be determinative of an issue in pending litigation in the certifying court *and* there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, subd. 3 (emphasis added). This procedure exists to permit "certification of novel or unsettled questions of state law for authoritative answers by a State's highest court," and thereby "save" the certifying federal court "time, energy, and resources," as well as allow it to "help build a cooperative judicial federalism." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997) (cleaned up). However, the decision to certify a question of state law rests in "the sound discretion of the district court," *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881 (8th Cir. 1996), and is "never obligatory, even when state law is in doubt," *U.S. Bank Nat'l Assn. v. PHL Variable Ins. Co.*, No. 12-cv-877 (JRT/TNL), 2015 WL 6549595, at *1 (D. Minn. Oct. 27, 2015) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974)). In fact, less than a month ago, the Eighth Circuit denied a motion to certify a question of law to the Arkansas Supreme Court, and, in so doing, reaffirmed the longstanding principle that, "[a]bsent a close question and lack of state sources enabling a nonconjectural determination, a federal court should *not* avoid its responsibility to determine all issues before it." *Smith v. SEECO, Inc.*, 922 F.3d 406, 412 (8th Cir. 2019) (emphasis added) (quoting *Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake, Minn.*, 771 F.2d 1153,

1157 n.2 (8th Cir. 1985)). In other words, "[t]he most important consideration guiding the exercise of [the] discretion [of whether to certify a question of state law to a state Supreme Court] is whether the reviewing court finds itself *genuinely uncertain* about a question of state law." *Johnson v. John Deere Co.*, 935 F.2d 151, 153 (8th Cir. 1991) (emphasis added) (quoting *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988)); *accord Sari v. Wells Fargo Bank, N.A.*, 587 Fed. App'x 342, 343 (8th Cir. 2014) ("We deny [plaintiff's] motion for certification because we are not uncertain about the question of state law he raises.").

### 2. *Analysis*

The Court finds certification unnecessary here, for three primary reasons. First, and most importantly, the Court is not "genuinely uncertain" about its interpretation of *Finn*, as set forth in its *Boosalis* Order and now again in this Order. *Johnson*, 935 F.2d at 153. Indeed, the Court finds that its interpretation of *Finn* largely accords with that of Judge Kishel, who is the only other jurist to have written at length about the legal implications of *Finn*. (*See, e.g.*, *supra* at 40-41.)

Next, although the Court acknowledged above that other cases may present "closer calls" as to the *application* of *Finn* (*id*. at 45-46), the Court in no way believes that the *legal* portion of this Order constitutes a "conjectural" interpretation of *Finn* in particular, or of Minnesota state law in general. *Smith*, 922 F.3d at 412. Indeed, the fact that a recent Minnesota Supreme Court decision even speaks to the relevant legal issues in and of itself distinguishes this case from other instances where this Court has been confronted by a truly "novel" or "unsettled" question of state law. *See, e.g.*, *Friedlander v. Edwards Lifesciences,*

*LLC*, No. 16-cv-1747 (SRN/KMM), 2016 WL 7007489, at *5 (D. Minn. Nov. 29, 2016), *cert. granted*, 900 N.W.2d 162 (Minn. 2017) (certifying question regarding the interpretation of the Minnesota Whistleblower Act to the Minnesota Supreme Court, because there was *no* "controlling precedent" that interpreted the at-issue provision of the Act in light of a recent legislative amendment, and because "[n]either the text of the amending act nor the legislative history behind it" provided a clear answer to the relevant question).

Finally, to the extent the Court erred in its analysis, the Eighth Circuit provides a forum by which to remedy that error. (*Cf. supra* at 22-23 (discussing the *Boosalis* appeal).)

Defendants make two additional arguments to the contrary, neither of which the Court finds availing. First, Defendants suggest that, because the Fifth Circuit Court of Appeals once certified an analogous legal question involving the interpretation of Texas's fraudulent transfer act, the Court should do likewise here. *See Janvey v. Golf Channel*, 780 F.3d 641 (5th Cir. 2015), *cert. granted*, 487 S.W.3d 560 (Tex. 2016); *see also supra* n.20 (briefly discussing this case's facts). However, as the Trustee correctly notes, the Fifth Circuit only certified that legal question because there was express disagreement between the District Court and the Fifth Circuit panel, "none of whom had the benefit of a Texas Supreme Court case defining reasonably equivalent value." (Pl.'s Opp. Br. at 16.) Here, by contrast, not only does this Court have the benefit of *Finn*, but there is also no express

disagreement among members of the District or the Eighth Circuit (or even the state courts, for that matter) as to the relevant legal questions.[22]

Second, Defendants also contend that, because the legal questions addressed by this Order will "likely reoccur" in some of the other pending "Petters claw back" cases, and will prove "dispositive" in those cases, certification is particularly appropriate. (*See* Defs.' Summ. J. Br. at 23-24 (citing "more than twenty" pending cases).) As an initial matter, and as the Court noted above, there are only a handful of "Petters claw back" cases actually pending in the District. (*See supra* n.12.) Moreover, to the extent Defendants are correct about the number of cases, the Court finds that this number must be tempered by the Trustee's assertion that several of these matters "are subject to active settlement negotiations," and involve different kinds of "non-lender" defendants. (*See* Pl.'s Opp. Br. at 16-17.) Finally, in any event, there is no need to even consider the "dispositive" effect a Minnesota Supreme Court ruling may have on future cases because the undersigned lacks "genuine uncertainty" about its legal reasoning here. *Johnson v. John Deere Co.*, 935 F.2d

---

[22]     Although Defendants repeatedly imply that this Court's decision and the Judge Kishel "effect of *Finn*" decision are at odds (*see, e.g.*, Defs.' Reply Br. at 12), that is not the case. True, Judge Kishel declined "to reach the theory of unenforceability as a matter of public policy" (which the Court relied on above), on grounds that "unenforceability" could be determined solely by reference to law holding that contracts "fraudulently induced" are "voidable." *See In re Petters Co., Inc.*, 550 B.R. at 479 n.32 and accompanying text. However, a fair reading of Judge Kishel's decision makes plain that he was not "rejecting" the "public policy" theory adopted here and in *Boosalis*; indeed, as noted above, in conducting his analysis, Judge Kishel explicitly relied on the same pre-*Finn* federal bankruptcy case law that the Court relied on here. (*See supra* at 40-41.)
     What's more, the Court finds that any differences between its analysis and Judge Kishel's analysis are largely semantic, and that, at root, the decisions reach virtually identical conclusions regarding how best to interpret *Finn* in the context of a Ponzi scheme like the one at bar.

at 153 ("The most important consideration guiding the exercise of [the] discretion [of whether to certify a question of state law to a state Supreme Court] is whether the reviewing court finds itself genuinely uncertain about a question of state law."). Indeed, to the extent *this* decision has any "dispositive" impact on the other pending "Petters claw back" cases before this District, that is solely because the Court's colleagues found this Order and the *Boosalis* Order persuasive. *See Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 239 (D. Mass. 2011) ("District courts are not bound to follow the decisions of other district courts."); *accord United Steel et al. v. Pension Benefit Guar. Corp.*, 602 F. Supp. 2d 1115, 1119 (D. Minn. 2009).

For these reasons, the Court denies Defendants' motion to certify questions of law to the Minnesota Supreme Court.

**D. Remaining Issues**

The Court will conclude by addressing a few remaining, ancillary disputes between the parties.

First, the parties dispute various issues with respect to the Trustee's "constructive fraud" claim, such as the appropriate statute of limitations. (*See, e.g.*, Defs.' Summ. J. Br. at 17; Pl.'s Opp. Br. at 18-23.) However, because the Court finds for the Trustee on its "actual fraud" claim, and because the relief sought under that theory is identical to the relief sought under its "constructive fraud" claim, the Court need not resolve these issues. (*Accord* Mar. 8, 2019 Hr'g Tr. at 4 (Trustee's counsel: emphasizing that the damages between the "actual fraud" claim and the "constructive fraud" claim are "duplicative").)

Second, the parties also dispute whether the Trustee has sufficiently set forth a case of "personal liability" against Kanios (as opposed to liability solely against her 401(k) retirement fund). Defendants contend that, under federal law, a lawsuit against an "employee benefit plan" (like a 401(k)) must separately "establish" "personal liability" with respect to a plan's beneficiary, and that the Trustee failed to do so here. (*See* Defs.' Opp. Br. at 18-19 (citing 29 U.S.C. § 1132(d)(1)).) Defendants do not cite any factual evidence in support of this contention. In response, the Trustee observes that Kanios "admits she received promissory notes from PCI and decided herself to invest in PCI through her pension plan," and is therefore "indisputably the beneficiary of the notes between PCI and [her 401(k) plans]." (Pl.'s Reply Br. at 11.) The Court agrees with the Trustee. The deposition transcripts of both Kanios and Papadimos, as well as the other record evidence, make clear that Kanios is the intended beneficiary of the at-issue 401(k) retirement fund (aptly titled "the Chris M. Kanios 401(k) Savings Plan"), and that PCI's interest payments were meant to (and, in fact, did) benefit Kanios directly, that is, by increasing the size of her retirement fund. Based on this evidence, and in the absence of any specific contention by Defendants to the contrary, the Court finds that the Trustee has sufficiently proven "personal liability" on Kanios's behalf. *Accord In re McCook Metals, LLC*, 319 B.R. 570, 590-92 (Bankr. N.D. Ill. 2005) (noting that, in deciding whether who the "beneficiary" to a pre-bankruptcy "transfer" is, courts should consider if "the transferor . . . intended to confer a benefit on that person," if the transferee "actually received a benefit," and if the benefit was "quantifiable").

Finally, the parties dispute what amount of prejudgment interest (if any) the Court should award the Trustee. The Trustee argues that the Court should simply adhere to its analysis from *Boosalis*, and apply Minnesota's statutory 10% per annum prejudgment interest rate from September 10, 2010 (when the Trustee commenced this lawsuit against Defendants) to the date of final judgment. (*See* Pl.'s Summ. J. Br. at 30-31 (citing *Kelley v. Boosalis*, 2018 WL 6433161 (D. Minn. Dec. 7, 2018) and Boosalis Doc. Nos. 117, 124).) For their part, Defendants again argue that the Court should re-consider its *Boosalis* decision (without citing any new case law or defendant-specific evidence), and should instead either (a) deny prejudgment interest all together, (b) grant prejudgment interest at the (far lower) federal interest rate, from a later date of the litigation (such as October 31, 2017, the date Martens issued his final expert report) to the date of final judgment, or, at worst, (c) grant prejudgment at the federal interest rate from September 10, 2010 to the date of final judgment. (*See* Defs.' Opp. Br. at 19-22.) In making this argument, Defendants rely heavily on equitable considerations, namely, that "this adversary proceeding [was] part of a large, extraordinarily complex bankruptcy proceeding," involving "questions of unsettled, and shifting, law," and that it was therefore "reasonable for Defendants to decline payment and approach the Court to adjudicate the rights of the parties." (*Id*.)

For the reasons already explained in the *Boosalis* Order, Minnesota law, not federal law, provides the prejudgment interest rate for this action. *See Kelley v. Boosalis*, 2018 WL 6433161, at *3-4 (holding that, because Minnesota law "supplied the substantive basis for the Trustee's claims," Minnesota law governs the application of prejudgment interest).

Moreover, as the Court also noted in its *Boosalis* Order, far from being an unusual occurrence, "[c]ourts regularly award prejudgment interest *whenever* damages lawfully due are withheld, unless there are *exceptional circumstances* to justify the refusal," so as to both "compensate prevailing parties for the true costs of money damages incurred, and . . . promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation." *Kelley v. Boosalis*, 2018 WL 6433161, at *2, *4 (emphasis added) (cleaned up); *accord In re RFC & ResCap Liquidating Trust Litig.*, No. 13-cv-3451 (SRN/HB), 2019 WL 1237166, at *8 (D. Minn. Mar. 18, 2019) (same, and also in the context of a years-long, highly complex litigation). Defendants do not point to any "exceptional circumstances" here, such as bad faith on the part of the Trustee.

Finally, although Defendants argue that it is unfair to charge them prejudgment interest from "the commencement of this action" to the present, rather than from some later date to the present, the Court declines to arbitrarily pick a "fair start date" for the application of prejudgment interest, as that would conflict with the statute's mandatory language. *See* Minn. Stat. § 549.09, subd. 1(b) (stating that prejudgment interest "*shall* be computed . . . from the time of the commencement of the action . . . or the time of a written notice of claim, whichever occurs first") (emphasis added); *see also Tate v. Scanlan Int'l, Inc.*, 403 N.W.2d 666, 674 (Minn. Ct. App. 1987) (reversing trial court for computing prejudgment interest at a post-commencement date, in an attempt to account for "delay result[ing] from [plaintiff's] request for a trial date continuance," and declaring that "the language of the statute is mandatory"). And, even if the Court could apply prejudgment interest from whatever date it deemed "fair," the Court would simply stick with the date

that this action commenced, again, for the reasons stated in its *Boosalis* Order(s). (*See, e.g.*, Boosalis Doc. No. 127 at 4-5 (rejecting argument that an "award of prejudgment interest in this case" was "unfair because interest accumulated due to factors outside of [Boosalis's] control," such as "consolidation of discovery," and instead observing that "awarding prejudgment interest here serves the purpose of compensating the prevailing party for the true costs of the money damages incurred," and further noting that PCI's creditors have been waiting "years" to receive any recovery on their lost principal investments).)

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment [Doc. No. 108] is **GRANTED**;

2.  Defendants' Motion for Summary Judgment, or in the Alternative, for an Order Certifying Questions of Law to the Minnesota Supreme Court [Doc. No. 102] is **DENIED**;

3.  Plaintiff is accordingly entitled to recover prejudgment interest from Defendant Papadimos on the amount of $3,126,524.37, and from Defendant Kanios on the amount of $572,500.22, at the rate of 10% per annum from September 10, 2010 until final judgment is entered; and

4.  Within seven days of this Order, the parties shall jointly file a calculation of the appropriate award of prejudgment interest pursuant to this Order so that the Court can enter final judgment in this matter.

5.  The pending motions in limine [Doc. Nos. 48, 53, 60, 61, 62, 63, 67, 70, 73, and 76] are **DENIED** as moot.

Dated:  May 20, 2019                                    s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge